### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

———————————————————

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CRIMINAL ACTION** |
| **v.** | ) | **NO.  21-40012-TSH** |
| | ) | |
| | ) | |
| **AUGUSTUS ("BOBO") KORMAH,** | ) | |
| **Defendant.** | ) | |

———————————————————

### AMENDED ORDER AND MEMORANDUM OF DECISION\*
**January 31, 2023**

**HILLMAN, S.D.J.**

### Background

On March 11, 2021, an Indictment issued charging Augustus Kormah ("Bobo" or "Defendant") with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1)(Count One) and possession with intent to distribute cocaine in violation of 21 U.S.C. §841(a)(1).  The charges arise out of officers' observations of an object bulging from the sock of Fodee Kromah ("Kromah"), an acquaintance of Bobo's, while speaking with Bobo and Kromah after they were stopped for suspected drug activity and various search warrants that followed.

This Order and Memorandum of Decision addresses the following motions to suppress filed by the Defendant: (1)  Defendant's Motion To Suppress (Warrantless)(Docket No. 51); Defendant's Motion to Suppress (Warrant- 11 Franklin Street Apt. 23)(Docket No. 53); and (3) Defendant's Motion to Suppress (Warrant-Cell Phones)(Docket No. 55)("Mot. Supp. Cellphones"). For the reasons set forth below, these motions are *denied*.

———————————————

\* This Amended Order and Memorandum of Decision makes no substantive changes to the original Order and Memorandum of Decisions filed this day.  Rather, the Court has deleted facts on pages 8-10  of the original opinion which it deems redundant.

## Facts[1]

Prior to the events of September 11, 2020, Bobo was well known to the WPD as he had multiple prior arrests for drug distribution, possession with intent to distribute, possession of a firearm, and violent offenses, including armed robbery.  Moreover, prior to September 11, 2020, a confidential source ("CS") had provided Lt. Hanlon with information that a male individual known to him/her as "Bobo": (1) was selling large quantities of cocaine, (2) drove a black Jaguar SUV with the license plate number specified by the CS, (3) was on court ordered GPS monitoring, and (4) living with girlfriend outside the City.[2]

On the morning of September 11, 2020, at approximately 6:00 a.m., Lt. Hanlon and a group consisting of 6-7 WPD police officers and state police detectives were conducting surveillance at 11 Franklin.  At around 7 a.m., they observed Bobo exit the  apartment building with a female (later identified as his girlfriend), enter the Jaguar and drive away.  Lt. Hanlon and other officers (including Officer Williams) followed them to the University of Massachusetts Hospital on Lake Avenue, Worcester ("UMass Hospital") where Bobo dropped the woman off (it was later learned she worked there).

The surveillance team continued to follow Bobo through a nearby neighborhood. Lt. Hanlon and Officer Williams observed Bobo engage in what appeared to countersurveillance

---

[1] Lieutenant Michael Hanlon ("Lt. Hanlon") and Larry Williams ("Officer Williams") of the Worcester Police Department ("WPD") testified on behalf of the United States ("Government") and were cross-examined by defense counsel. Lt. Hanlon and Officer Williams are assigned to the WPD Vice Squad which investigates drug dealing and prostitution.

[2] Lt. Hanlon and Officer Williams had worked with the CS on other investigations, and both testified that the CS had provided them with helpful and accurate information.  They took steps to corroborate the information provided by the CS, including that Bobo drove a black Jaguar with the specified license plate. Also, while surveilling Bobo, they confirmed that he lived outside of Worcester, more specifically, at 11 Franklin St, Apt. 23, West Boylston, MA ("11 Franklin").  After Bobo was arrested on September 11, 2020, Lt. Hanlon confirmed that Bobo was subject to GPS monitoring as a condition of his state probation.

techniques; Bobo frequently looked in the rearview mirror and continued to drive around the same neighborhood for about five minutes pulling over multiple times on side streets and allowing cars to pass him.  Eventually, Bobo drove to 345 Greenwood Street, Worcester ("345 Greenwood") an "industrial complex of sorts" consisting of two long rows of buildings separated by a driveway or alleyway (the "alleyway"). There was a parking lot in front of the buildings and a parking lot in back accessed by the alleyway.  The parking lot in front of the buildings contains over a hundred lined parking spaces. Behind the buildings is a small parking area in the back of which there is a wooded area (the "woodline"). Although there is room for parking, there are no designated parking spaces. Bobo drove down the alleyway between the two rows of buildings into the back where he reversed the Jaguar, backed-up and parked with the rear of the car near woodline. Bobo remained in the vehicle.

At this time, the surveillance team had pulled into a parking plaza across the street from 345 Greenwood and parked in different locations.  Officer Williams had parked in a location which gave him a direct line of sight of Bobo's movements, and he relayed his observations via radio to the other members of the surveillance team, including that a gray Nissan Altima ("Altima"), had driven down the alleyway, turned around, backed up and parked next to Bobo. Officer Williams then observed an individual, later identified as Kromah, get out of the Altima and entered the Jaguar. After being inside less than a minute, Kromah got out of the Jaguar and walked back toward the Altima.

Because Bobo and Kromah had parked behind the buildings out of view (when there were plenty of parking spaces out front) and given what he knew of Bobo's past history as a drug dealer, his evasive action while driving through the Grafton/Hamilton Street neighborhoods on the way to 345 Greenwood, and Kromah's actions of momentarily getting into Bobo's car then

leaving, Officer Williams believed that a drug transaction had taken place.  The decision was then made that the surveillance team would pull into the rear of 345 Greenwood and stop Bobo and Kromah. At this point, 5-6 law enforcement vehicles drove down the alleyway to the rear of the buildings. As Lt. Hanlon pulled down the alleyway, he observed Kromah standing between the Altima and Bobo's Jaguar.  Lt. Hanlon pulled up near Kromah, got out of his unmarked vehicle and identified himself as a police officer.  Kromah then started to backpedal away from Lt. Hanlon who instructed him to stop (he did).  As Lt. Hanlon was detaining Kromah other officers were detaining Bobo who was sitting in the driver's side of the Altima. All the officers were armed-- Lt. Hanlon did not have his weapon drawn and was not aware of any other officer having a weapon drawn. Sergeant Scott indicated in his report that he approached the vehicles with his weapon drawn, but that he holstered the weapon once Bobo was placed in handcuffs.

Lt. Hanlon spoke briefly with Kromah to inform him why he was being stopped. He then went over to speak with Bobo. After Lt. Hanlon read him his rights, Bobo stated he understood and agreed to speak with him. In response to Lt. Hanlon's questions, Bobo stated that he had come from his house and had dropped his girlfriend off at work. In response to questions regarding the whereabouts of his residence and his earlier evasive driving maneuvers, Bobo told Lt. Hanlon that they (law enforcement) already knew where he lives and that he knew he was being followed—he correctly identified three of the surveillance cars that he believed were following him. When asked why Kromah had gotten in and out of the vehicle, Bobo stated that he and Kromah were cousins, however, he later stated that Kromah got in and out of his vehicle because he left his phone in the car.  Bobo also told Lt. Hanlon that a set of keys in the Altima belonged to him.

4

After concluding his conversation with Bobo, Lt. Hanlon returned to Kromah to further question him. However, after being read his *Miranda* rights, Kromah indicated that he wanted to speak with a lawyer and all questioning stopped.  While Lt. Hanlon was advising Kromah of his rights, he noticed that Kromah would not make eye contact with him—instead, Kromah kept looking over at Bobo and around the parking lot.  Lt. Hanlon testified that he thought Kromah seemed nervous and appeared to be fearful about telling him anything in front of Bobo.  Lt. Hanlon also observed Kromah fidgeting with one of his shoes that was only partially on and Kromah kept moving his foot like he was attempting to slide his shoe on all the way.  Lt. Hanlon then looked closer at Kromah's foot and observed a knot protruding from his sock which was a little larger than a golf ball.  Lt. Hanlon retrieved the item which looked to be about an ounce of crack cocaine.[3]  Lt. Hanlon then placed Kromah under arrest. Bobo was also placed under arrest. Additionally, both vehicles were searched and then transported to the WPD. In accordance with standard WPD policy, Bobo and Kromah were searched prior to being placed on the police transport vehicle. A pat frisk of Bobo turned up $2,557 found in various pockets of his pants.

Lt. Hanlon and other members of the surveillance team then left the scene and proceeded to West Boylston to secure 11 Franklin while Officer Williams returned to the police station to obtain a search warrant for the residence.  Lt. Hanlon used the set of keys recovered from the Altima and found that one of the keys unlocked the door to the apartment.  Lt. Hanlon did not open the door and did not enter the apartment. Lt. Hanlon and other members of the team returned to the police department to assist Officer Williams in obtaining the search warrant. Several officers remained at 11 Franklin to secure the residence.

---

[3] The substance later tested positive for approximately 24 grams of cocaine.

In the affidavit he prepared in support of a search warrant for 11 Franklin, Officer Williams indicated that law enforcement had received corroborated information from a CS that Bobo lived outside of Worcester with his girlfriend (the CS had not provided a specific address). Officer Williams indicated that that the CS had provided reliable information in the past-- he described one instance in which the CS had provided information about a subject distributing drugs from an apartment in Worcester and thereafter, the CS made controlled buys from the subject. The CS's information led to a search of that apartment where officers discovered drugs and arrested the subject. Officer Williams did not include any specific details regarding the CS's prior assistance (like names or dates).

Once a search warrant was obtained, Lt. Hanlon and Officer Williams returned to 11 Franklin. Upon entering the apartment the officers observed and seized envelopes and paperwork with Bobo's name (Augustus Kormah) on it, and a black bag which appeared to contain rolls of money. Additionally, sticking out of the left side of the black bag was an extended magazine attached to a firearm—the firearm was at least partially loaded.  The firearm, which did not have a locking mechanism, as would be required since it was not in a locked compartment, was seized.[4]  Ammunition was also seized from elsewhere in the apartment. The black bag also contained a small plastic packet containing tobacco which was seized because the officers thought it might be amenable to obtaining prints from. After later returning to the police station, Officer Williams confirmed that Bobo did not have license to carry a firearm.

---

[4] During the search, officers observed items which led them to believe that children live in or had access to the residence. The weapon was seized as Officer Williams and Lt. Hanlon could not leave a loaded improperly stored firearm where children might be present.

**Discussion**

Defendant seeks to suppress the items seized from 11 Franklin pursuant to a search warrant issued by the Massachusetts Superior Court on the grounds that the affidavit in support thereof lacked probable cause and impermissibly relied on information and evidence obtained when the police unlawfully seized and searched he and Kromah. He also seeks to suppress all evidence seized as a result of the searches and seizures of two cellphones conducted pursuant to a warrant issued by this Court (Hennessy, M.J.), on the grounds that: (1) the affidavit in support of said search warrant did not contain facts necessary to establish probable cause to search the phones, did not establish probable cause to believe that the evidence sought would be located within the phones or would be found in every location searched within the phones, and relied upon information which was unlawfully obtained by law enforcement; (2) the warrants were overbroad and not sufficiently particularized as to specific locations in the phone to be searched; (3) the search warrants for the cellphones were not sought or executed within a reasonable amount of time after they had been seized without a warrant; and (4) he did not consent to the seizures and did not knowingly and voluntarily waive any rights[5]. Finally, Defendant seeks to suppress several items seized as the result of an alleged unconstitutional warrantless stop, seizure and search of his person and two vehicles, the Jaguar and Altima, including money, two cellphones, paperwork, and keys. Because findings regarding the lawfulness of the initial search of Defendant and the two vehicles will inform the remainder of the Court's analysis, I will begin my discussion with the warrantless stop.

---

[5] It is undisputed that Bobo did not consent to the search of his person, 11 Franklin or his cellphones or otherwise voluntarily waive any rights to contest the searches (other than with respect to statements made after he was *Mirandized*).

<u>Motion to Suppress Items Seized During the Stop and Warrantless Search of 11 Franklin</u>

<u>*Items Seized Without a Warrant at the Scene of the Stop*</u>

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that, consistent with this prohibition, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. 1868. Thus, where a law enforcement agent has a reasonable suspicion that an individual(s) is engaged in criminal activity, he is "permitted to make a brief investigatory stop, commonly known as a *Terry* stop." *United States v. Rabbia*, 699 F.3d 85, 89–90 (1st Cir. 2012). " '[T]he officer must have a particularized and objective basis for suspecting the person stopped of criminal activity, rooted firmly in specific and articulable facts.' " *Id.* (quoting *United States v. Brake,* 666 F.3d 800, 804 (1st Cir.2011)). Reasonable suspicion can be established by an informant's tip if the tip possesses sufficient "indicia of reliability." *United States v. Sanchez*, 817 F.3d 38, 42 (1st Cir. 2016). Additionally, "officers may pat-frisk the person … if they have reason to believe he is " 'armed and dangerous.'" *Id*.  The officers' actions must be "reasonably related in scope to the circumstances which justified the interference." *United States v. Acosta–Colon,* 157 F.3d 9, 14 (1st Cir.1998).

The officers' initial decision to stop Bobo (and Kromah) at the Greenwood St. business enterprise for purposes of investigating possible criminal behavior is unassailable as based on the totality of the circumstances. The officers had more than reasonable suspicion to believe that they had observed a drug deal. Those totality of the circumstances include that: (1) a CS who had proved reliable in the past had informed law enforcement that Bobo was selling drugs out of s

black Jaguar—law enforcement had been able to corroborate information provided by the CS;
(2) law enforcement was aware that Bobo had a criminal history which included possession and
distribution of cocaine; (3) after dropping off his girlfriend at work, Bobo engaged in counter
surveillance activities which suggested that he knew he was being followed by officers and was
attempting to shake them; (4) Bobo's presence at 345 Greenwood was suspicious as it was still
early in the morning, the location was a business complex, and rather than parking out front in
any of the hundreds of designated parking spaces, he proceeded down an alleyway to the rear of
the buildings and parked his car outside of the public view in a manner that permitted him to
observe anyone coming down the alley and leave quickly; (5) the Altima ignored the numerous
parking spaces in front of the businesses, drove down the alley and parked next to Bobo (also
backing into the space)—the driver, Kromah, then got out of the car, entered Bobo's Jaguar and
exited after only a brief time; and (6) as officers approached Kromah, he appeared nervous.

Because the totality of the circumstances provides an objectively reasonable,
particularized basis for the officers to have suspected Bobo of participating in a drug deal, the
Court finds that they properly conducted a *Terry* stop. *See United States v Sierra-Ayala*, 39 F.4th
1 (1st Cir. 2022)(finding totality of circumstances did not provide objectively reasonable,
particularized basis for suspecting defendant of criminal activity where he was merely present in
area of expected criminal activity; *Terry* stop must be more than inchoate and unparticularized
hunch and must be specifically focused on individual under scrutiny (citing *Terry*, 392 U.S. at
27, 88 S.Ct. 1868)). Put another way, "a reasonably prudent and experienced police officer
would have recognized this behavior as consistent with the consummation of a drug deal." *See
United States v. Miller*, 959 F.2d 1535, 1539 (11th Cir.1992) (describing drug transactions in
which "the supplier arrived by car, [the customer] got in the car, the car drove around the block

during which time the exchange of drugs for money occurred, and then the car returned to the residence and dropped [the customer] off"); *United States v. Morris*, 223 Fed.Appx. 491, 495 (7th Cir.2007) (referring to "behavior consistent with drug-dealing, namely entering a car, riding around the block, and then exiting the vehicle"); *cf. United States v. Funches*, 327 F.3d 582, 586 (7th Cir.2003) ("Experienced agents would recognize the use of an intermediary and the parties moving to a less-visible location before goods are exchanged as common characteristics of drug transactions undertaken to protect the identity of sellers and to avoid detection by authorities."); *see also United States v. Rabbia*, 699 F.3d 85, 89 (1st Cir. 2012)(although behavior in question could have been consistent with legitimate commercial activity, the circumstances reasonably supported more sinister activity). Moreover, given what the officers knew of Bobo's criminal record (which includes a firearms offense and armed robbery), they were justified in conducting a pat frisk of both Bobo and Kromah to ensure their safety.[6]

However, Bobo argues that the officers went beyond conducting a *Terry* stop[7]—he asserts that immediately upon approaching and stopping him, officers placed him under arrest despite lacking probable cause to believe a crime had been committed. Bobo also argues that the officers had no basis to conduct a pat frisk of his person.  The Government, on the other hand, argues that Bobo was not "seized" upon the officers initial approach, rather the officers' actions never went beyond the parameters of a *Terry* stop—including initially handcuffing him and conducting a pat frisk—both of which were reasonably necessary to ensure their safety.  The officers then acquired probable cause to arrest him when they discovered the cocaine on

---

[6] While I find that under the totality of the circumstances the officers pat frisk of Kromah's person and the removal of the cocaine from his sock was a within the scope of a proper *Terry* stop, this finding is not necessary to the Court's findings regarding the legality of the stop and arrest of Bobo as he has no standing to challenge the officers' actions towards Kromah.

[7] "An encounter between police and an individual which goes beyond the limits of a *Terry* stop … may be constitutionally justified only by probably cause or consent." *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993).

Kromah's person. The Court will assume that probable cause did not exist to arrest Bobo at the time of the initial stop and will examine at what point interaction between law enforcement went beyond the scope of a *Terry* stop thereby requiring probably cause for the officers to seize Bobo. In making this determination, the Court is mindful that the Government bears the burden of establishing that "the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983); *see also Perdue*, 8 F.3d at 1462 (that seizure was reasonable at inception does not end inquiry—court must determine whether was reasonable as conducted).

In support of its position that the seizure fell within the parameters of a *Terry* stop, the Government points out that in making his argument, Bobo cites to the affidavit in support  a warrant to search Bobo's cellphones prepared by Special Task Force Officer George Adams ("Task Force Officer Adams") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  In his affidavit, Task Force Officer Adams states that "officers removed [Bobo] from the Altima, *arrested both* subjects, and conducted a pat frisk of both men. During the pat frisk, … officers removed approximately $2,557 from [Bobo's] pants pockets." *See Mot. Supp. Cellphones*, at *Ex. 2* (*Aff. in Supp. of an Appl. For Search Warrants*)(Docket No. 55-2) at ¶ 20. The Government argues that Task Force Officer Adams, who was not present at Bobo's arrest and drafted the affidavit months later, was merely summarizing the events which led to Bobo's arrest--  a determination of when an arrest occurred must be made based on the contemporaneous accounts of the arrest contained in police reports and the testimony of officers who were present at the scene.  The Government further argues that even if Bobo was immediately placed under arrest at the time of the stop, when probable cause was admittedly lacking, there is no basis to

suppress the evidence as Bobo was read his *Miranda* rights and agreed to talk to Lt. Hanlon and the subsequent discovery of cocaine on Kromah's person (which Bobo does not have standing to challenge) created the necessary probably cause for the arrest. Put another way, the Government argues that because Bobo suffered no prejudice, even if he was wrongfully arrested at the time of the initial stop, suppression of the evidence found at the scene is not warranted.

The court will first address Bobo's contention that given the intrusiveness of the officers' actions (he was immediately handcuffed and read his *Miranda* rights) he was de facto arrested when the officers first stopped him.

> There is no bright line that distinguishes a valid *Terry* stop from its invalid counterpart (commonly known as a de facto arrest). Sometimes, the line can be drawn by asking whether 'a reasonable man in the suspect's position would have understood his situation' as being an arrest. But it is an oversimplification to suggest that every case will fall along this continuum. *Terry* stops must be tailored to fit the exigencies of particular situations, and the mere presence of arrest-like features is not fatal to the validity of a particular stop. The critical consideration is whether the arrest-like features can be reconciled with the limited nature of a *Terry* stop.
> Evaluating whether the scope of an investigatory stop is reasonable demands careful consideration of the totality of the circumstances. This means weighing, among other things, 'the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion.' Above all, an inquiring court must bear in mind that "'it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'"
> ….
>
> the limits of a *Terry* stop are not automatically transcended by an officer's use of … prophylactic measures. When officer safety is a legitimate concern, a *Terry* stop appropriately may involve the application of handcuffs; or effecting a stop at gunpoint; or ordering a suspect to the ground. In an appropriate case, such prophylactic measures can be employed in combination.
> … The appropriate length of a *Terry* stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions.

*United States v. Pontoo,* 666 F.3d 20, 30 (1st Cir. 2011)(internal citations and citations to quoted cases omitted).

Contrary to Bobo, the Government takes the position that Bobo and Kromah were not arrested until the cocaine was discovered on Kromah's person, *i.e.*, they were not arrested when first stopped by law enforcement and placed in handcuffs. First, the officers who initially stopped Bobo were aware of his criminal background which included a prior firearms offense and violent offenses including armed robbery. Additionally, they had reasonable suspicion to believe that he had just participated in a drug deal—circumstances which render it reasonable for the officers to have handcuffed Bobo to neutralize any potential danger to their personal safety by preventing him from potentially obtaining any weapon he may have had on his person or in his car. *See Perdue*, 8 F.3d at 1463. Moreover, while Officer Scott had his gun drawn when approaching Bobo and Kromah, none of the other officers did and he immediately holstered his weapon after Bobo was handcuffed. That Officer Scott initially approached Bobo and Kromah with his weapon draw does not transform an otherwise legitimate *Terry* stop into an arrest.  *Id.,* at 1462 (not unreasonable for officers to execute *Terry* stop with weapons drawn as officers may take necessary steps to protect themselves if circumstances reasonably warrant such measures) and cases cited therein; *see also United States v. Rasberry*, 882 F.3d 241, 248 (1st Cir. 2018)(defendant who was handcuffed at initiation of *Terry* stop was suspected drug dealer and connection between drugs and violence is legendary).

Second, while there was no testimony regarding the length of the stop prior to Bobo's formal arrest, it is evident from the testimony of Lt. Hanlon and Officer Scott that the duration of the entire stop was relatively short and, in any event, during the entirety of the *Terry* stop, officers were diligently taking steps to determine whether a drug deal had taken place. *See Rasberry*, 882 F.3d at 248 (length of *Terry* stop taken in vacuum does not convert otherwise lawful stop into *de facto* arrest—whether *Terry* stop is of appropriate duration is gauged by

whether officers were diligently pursuing means of investigation that were likely to quickly establish whether their suspicions of unlawful activity were correct ).

Lastly, that the officers read Bobo his *Miranda* rights does not turn an otherwise valid investigative stop into an arrest—after all, the safeguards prescribed by *Miranda* come into play whenever the suspect's freedom is significantly curtailed and said suspect may be considered "in police 'custody' for purposes of *Miranda* before he has been 'arrested in the Fourth Amendment sense." *Perdue*, 8 F.3d at 1462-63. Therefore, although *Miranda* warnings *may* not have been required prior to law enforcement questioning Bobo concerning the events they had just witnessed, the fact that they were given does not turn this otherwise valid *Terry* stop into an arrest[8]. Accordingly, the Court finds that under the totality of the circumstances, law enforcement officers acted reasonably for Fourth Amendment purposes when they handcuffed Bobo and read him his *Miranda* rights. *See Id.*, at 1465 ("[p]olice officers must make a choice— if they are going to take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights) and cases listed therein which recognize that *Miranda* rights may be implicated during valid *Terry* stop. After being *Mirandized* Bobo told Lt. Hanlon that the keys and cellphone located in the Altima belonged to him. There is no basis for suppressing these statements.

An officer may arrest an individual where there exists " ' probable cause to believe that an individual has committed even a very minor criminal offense in his presence . . . . ' " *Goddard v. Kelly*, 629 F. Supp. 2d 115, 125 (D. Mass. 2009) (quoting *Atwater v. City of Lago*

---

[8] Consider that based on the force employed (Bobo was handcuffed and surrounded by multiple police officers-- one of whom had initially drawn his weapon), a reasonable person in Bobo's position may have believed that he was in custody and therefore, had the officers failed to *Mirandize* him, he could have argued that although the events did not exceed the scope of a *Terry* stop, any statements he made in response to police questioning should be suppressed. *See Perdue,* 8.F3d at 1464 (by employing an amount of force that reached the boundary line between a permissible *Terry* stop and an unconstitutional arrest, police created a "custodial" situation which implicated *Miranda* protections).

*Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001)). Bobo was not placed under arrest until Lt. Hanlon discovered the cocaine on Kromah's person which gave the officers the necessary probable cause to confirm their suspicion that they had indeed witnessed a drug deal take place. *See Rabbia*, 699 F.3d at 90 (officers observed two men engage with another man in what seemed to be the first stage of a commercial transaction in a back parking lot and then observed the defendant drive into the parking lot pick up one of the individuals and drop him off again a few minutes later—the individual upon exiting the defendant's car removed a bag from the trunk, appearing to complete the transaction. A reasonably prudent and experienced police officer would have recognized this behavior as consistent with the consummation of a drug deal) and the following cases cited therein: *United States v. Miller*, 959 F.2d 1535, 1539 (11th Cir.19920) (describing drug transactions in which "the supplier arrived by car, [the customer] got in the car, the car drove around the block during which time the exchange of drugs for money occurred, and then the car returned to the residence and dropped [the customer] off"); *United States v. Morris,* 223 Fed.Appx. 491, 495 (7th Cir.2007) (referring to "behavior consistent with drug-dealing, namely entering a car, riding around the block, and then exiting the vehicle"); *cf United States v. Funches,* 327 F.3d 582, 586 (7th Cir.2003) ("Experienced agents would recognize the use of an intermediary and the parties moving to a less-visible location before goods are exchanged as common characteristics of drug transactions undertaken to protect the identity of sellers and to avoid detection by authorities.").

"Once authorized to make a lawful arrest, law enforcement personnel may conduct a warrantless search of the person of an arrestee." *See United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997). Officers may also search the arrestee's vehicle if (1) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or (2) "it is

reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *See*

*Arizona v. Gant*, 556 U.S. 332, 343, 129 S.Ct. 1710 (2009) (internal quotation marks and

citations omitted).[9]  At the time Bobo was arrested he was not adjacent to his vehicle and was

already handcuffed, *i.e.*, secured. However, given the officers' observations which led them to

believe that the drug deal had been consummated in the Jaguar, they had reason to believe that

relevant evidence may be found in the vehicle and therefore, the search was lawful under the

automobile exception to the Fourth Amendment. Accordingly, once Bobo was arrested, the

police had probable cause to search the Jaguar incident to his arrest.[10]

### *Warrantless Search of 11 Franklin*

Bobo asserts that law enforcement performed an unconstitutional search at 11 Franklin

when, before obtaining a warrant, they tested the key that they had seized from Kromah's Altima

in the door of the residence (Bobo had told law enforcement that the keys were his). The First

Circuit has previously held that the turning of a key in the lock of a dwelling to be an

unreasonable warrantless search. *See United States v. Bain*, 874 F.3d 1 (1st Cir. 2017)(physical

intrusion into a protected area that results in the acquisition of information only fails to constitute

search if intrusion is permitted by license—the implicit license permits visitor to approach

residence, knock promptly, wait briefly to be received and then absent invitation to stay longer,

leave. Thus, police, even without a warrant, may approach a home and knock. Putting a key into

---

[9]  The Fourth Amendment's so-called automobile exception.

[10]  Similarly, law enforcement had probable cause to search Kromah's Altima. However, even if they did
not have probable cause to search the Altima, Bobo—who was only in the vehicle briefly and has not asserted any
property or possessory interest therein- did not have a reasonable expectation of privacy in the Altima, *see United
States v. Symonevich*, 688 F.3d 12, 18-21 and n. 3, and therefore, cannot challenge the search thereof. *See United
States v. Almeida,* 748 F.3d 41, 47 (1st Cir. 2014)( The Fourth Amendment's protection against unreasonable
searches may only be claimed where a defendant demonstrates that he has a reasonable expectation of privacy in the
place searched; as to a vehicle search, a defendant must show that he has a property or possessory interest therein in
order to establish a reasonable expectation of privacy. a person who is "merely a passenger" has no reasonable
expectation of privacy in a vehicle).

a lock to see if it fits is a search).[11]  The instant case is distinguishable from *Bain* and other cases discussed therein in that law enforcement officers did not test the key in the lock of 11 Franklin to determine that Bobo actually resided at that location (they already knew he did), rather they were simply determining which of the keys they obtained from the Altima worked on the door (presumably so they could open the door once they obtained the warrant).  Moreover, they were not testing the key to determine whether the key ring found in the Altima belonged to Bobo—he had already told Lt. Hanlon that they belonged to him. Thus, by trying the key in the lock, law enforcement was not attempting to obtain information to use against Bobo in a criminal prosecution. Nevertheless, the Court will assume that placing the key in the lock and confirming it unlocked the door was an illegal search.

However, that turning the key in the lock constituted an unlawful search does not end the inquiry. For the reasons more fully explained below, the Court finds the search of 11 Franklin was conducted pursuant to a valid warrant.  Moreover, officers determined to obtain the warrant prior to the key being tested in 11 Franklin and the fact that the key unlocked the entrance door was not necessary for the finding that there was probable cause to search the residence. Therefore, based on the independent sources doctrine, evidence found within the dwelling is admissible despite the initial Fourth Amendment violation. *United States v. Flores*, 888 F.3d 537, 546 (1st Cir. 2018)("The independent source doctrine obliges a reviewing court to answer two related questions: whether the officers' decision to seek a warrant was made independent of

---

[11] There are exceptions which justify entry into an apartment without a warrant—for example, police do not need a warrant to enter and search a residence where under "the totality of the circumstances, it is objectively reasonable for them to conclude evidence is at risk of being destroyed"—a risk which is "particularly heightened in drug cases, where evidence is 'easily destroyed … .'" *United States v. Morell-Oneill*, Cr. No. 18-10467-LTS, 2020 WL 5549121, at *3 (D.Mass. Sep. 16, 2020)(citation to quoted case omitted). However, in this case, law enforcement was aware that the other resident of the house, Bobo's girlfriend, was not at home. Moreover, officers did not attempt to enter the house to secure any evidence—they merely checked to see if the key opened the lock. Accordingly, this exception does not apply (to be clear, the Government has not suggested that it does).

what they had learned during their earlier (unlawful) entry, and if so, whether the affidavit that they submitted to procure the warrant, when stripped of any knowledge derived from the initial entry, contained enough facts to support a finding of probable cause").

### Searches Pursuant to A Warrant

#### *The Search of 11 Franklin*

Bobo asserts that the application in support of the search warrant for 11 Franklin failed to establish probable cause to believe that evidence of a crime would be found therein, that is, there is not a sufficient nexus between the alleged offenses and 11 Franklin; that police exceeded the scope of the warrant by seizing items not listed in the search warrant, *i.e.,* items other than "cash proceeds," "cell phone records" and "records associated with illegal drug sales;" and the application for the search warrant impermissibly relied on information that law enforcement obtained while illegally stopping and arresting him. The Government argues that the search warrant relied on legally obtained evidence, established a sufficient nexus between Bobo's alleged criminal activity and 11 Franklin (and if it didn't, the good faith exception established by *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984) applies), and the police did not exceed the scope of the search warrant by seizing items not specifically mentioned in therein because the items not listed were found in places where it was reasonable for the police to believe items specified in the warrant could be located. The Court has previously found that the evidence relied on by the affiant obtained by law enforcement during the stop and arrest of Bobo was not obtained illegally and therefore, will focus solely on Bobo's assertion that the application in support of the search warrant failed to establish  as sufficient nexus to 11 Franklin and/or probable cause for the seizure of the listed items.

Under the Fourth Amendment, the search of a dwelling must be reasonable and "subject to certain exceptions not relevant here, when 'a search [of a dwelling] is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness … requires the obtaining of a judicial warrant.' " *United States v. Flores*, 888 F.3d 537, 545 (1st Cir. 2018)(alterations in original)(citation to quoted case omitted). As just discussed, law enforcement conducted an illegal search of 11 Franklin when they tried the various keys on the key ring found in the Altima to determine if any unlocked the door (one did). Still, the "where … a search warrant is subsequently obtained and evidence is seized or knowledge obtained as a result of the later warrant-backed search, that evidence and/or knowledge may be admissible if the warrant derives from sources independent of the earlier (unlawful) entry." *Id.*

After Bobo was arrested, law enforcement secured 11 Franklin, without entering it, while Officer Williams returned to the police station to prepare an application for a search warrant. In the application, Officer Williams stated that police had obtained house keys from Bobo during the arrest and had confirmed that they worked in the door of the residence. However, Officer Williams also stated that he had verified that Bobo lived at that address through several independent means: (1) officers conducted surveillance of Bobo several weeks prior to September 11, 2020, and on one of those occasions officers followed him to 11 Franklin and saw him enter Apt. 23 using a key; thereafter, they saw his Jaguar parked in front of the apartment on numerous occasions; (2) on the morning of September 11, 2020, officers observed Bobo exit 11 Franklin (from Apt. 23);  and (3) after the arrest, one of the officers contacted the Worcester Superior Court Probation and confirmed that Bobo was on a court GPS monitoring system and that he resided at 11 Franklin. Thus, the warrant was obtained independently of the illegal search; that is, the application for the warrant established that law enforcement knew with

certainty where Bobo lived regardless of whether they tried the key and therefore, the information obtained when they tried the key was irrelevant to the determination of whether there was probable cause to believe that Bobo resided at 11 Franklin. Accordingly, evidence found in the residence will not be suppressed due to the officers' unlawfully unlocking the door to 11 Franklin prior to obtaining a warrant. However, the fact that the officers' obtained the warrant independent of their initial "illegal search" of the residence  does not end the inquiry—Bobo further argues that the search warrant was invalid because it did not establish probable cause to believe that drugs or evidence of drug distribution would be found in 11 Franklin.

The affidavit in support of the warrant must establish probable cause to search the suspect's residence by either: (1) specifying direct evidence establishing a nexus between drug activity and the home, or (2) setting forth facts permitting the inference that drug-related evidence would be found there.  *See United States v. Roman*, 942 F.3d 43, 51 (1st Cir. 2019)(inquiry is whether "there is reasonable cause to believe that the specific things to be searched for and seized are located on property to which entry is sought")(citation to quoted case omitted).  Moreover, probable cause cannot be established merely because there are facts to support a finding that a suspect sells drugs and in the officers' experience, drug dealers tend to store evidence of their trade in their homes. *Id.*, at 51-52. Rather, the police must make additional specific observations connecting the drug dealing to the residence, or be aware of facts which would "permit an inference of nexus to a defendant's residence," such as "evidence that drug distribution 'was being organized from [the defendant's residence],' that the defendant used his home as a communications hub for drug activity, or that the defendant 'move[d] back and forth from his residence in relation to drug transactions.'" *Id.* at 52 (internal citations and citations to quoted cases omitted).

In this case, the CS indicated that Bobo was selling cocaine throughout Worcester and that he drove a black Jaguar. The CS also stated that Bobo lived outside of Worcester, and s/he was aware that he used his cellphone to arrange drug deals at multiple locations. Officer Williams and other officers were also aware that Bobo had a prior criminal history involving drug distribution. Bobo was observed on multiple locations at 11 Franklin. No other potential locations were identified which Bobo could be using to store/prepare drugs for sale and/or to store proceeds from drug transactions. Officer Williams stated that based on his training and experience it is common for persons selling large quantities of drugs to store the drugs, cash and phone records where they reside, and he believed that Bobo did so. Finally, Officer Williams summary of the facts established that officers followed Bobo from 11 Franklin to 345 Greenwood where the alleged drug transaction took place-- Bobo's only stop prior to meeting up with Kromah at 345 Greenwood was to drop his girlfriend off at work. Under these circumstances, I find that the nexus element was met, that is, that the application in support of the search warrant established **"that 'enumerated evidence of the offence w[ould] be found at the place searched.'".** *Id.* (where the "affidavit established the defendant was 'a long-time, successful drug trafficker,' identified '[n]o other residence or drug-dealing headquarters,' and contained a statement from a law enforcement affiant that drug traffickers commonly keep drug-related evidence at their homes," a sufficient nexus can be inferred "between drug activity and the defendant's residence.")

As to Bobo's arguments that the search exceeded the scope of the warrant, little need be said. I find that it is clear that officers searched those areas where the items listed in the search warrant were likely to be found. Moreover, much of the evidence Defendant seeks to suppress was found in plain view.  Finally, even if the Court were to find that the affidavit in support of

the application for a search warrant lacked probable cause to establish that evidence of a drug trafficking crime would be found at 11 Franklin, I agree with the Government that the items would still be admissible under *Leon's* good faith exception. I so find, because the officers' reliance on the warrant to search 11 Franklin was objectively reasonable given that the factual allegations in the affidavit, on the whole, suggested a close nexus between that location and Bobo's trafficking of illicit drugs.

<u>Search of Bobo's Cellphone Pursuant to a Warrant</u>

For the reasons set forth below, the Court also declines to suppress the evidence obtained from Bobo's cellphones. Bobo asserts that the application in support of the warrant to search the cellphones recovered at the time of his arrest was insufficient to establish probable cause to believe that the evidence sought (evidence relating to his customers, possession of a firearm and/or drug supply source and the like) would be found therein and therefore, all evidence seized directly or indirectly as a result of the search of the phones should be suppressed. Bobo also asserts that the warrant to search the cellphones was overbroad in that it was not sufficiently particular thus allowing for a search of all applications and locations on the phones. Finally, Bobo asserts that the Government failed to seek warrants to search the cellphones within a reasonable time after their seizure (138 days passed from September 11, 2020, the date of the seizure, until January 27, 2021, the date the Government applied for the search warrant). The Government, on the other hand, argues that the Bobo's motion to suppress should be denied because there was a sufficient nexus between Bobo's alleged crime and the cellphones such that based on the totality of the circumstances there is a "fair probability" that evidence of a  crime will be found on the phones.

As to whether the application to search the cellphones was overbroad, the Government argues first that it is impossible for law enforcement to know in advance of the search where a criminal may hide illicit material on a phone and in this case, the search was limited in scope, *i.e.*, only to those items on the phones that are "photographs, emails, messages, applications, videos, and records, in whatever form, and tangible objects that constitute evidence or instrumentalities" and are related to the relevant crimes. As to the delay in applying for a search warrant, the Government argues that under the circumstance of this case, was not unreasonable and, in any event, no purpose would be served by suppressing the evidence obtained as a result of the search of the phones based on the delay.

### *Whether the Affidavit in Support of the Application to Search the Cellphones Established Probable Cause to Believe Evidence of a Crime would be Found Therein*

Bobo asserts that there was insufficient information in the application for the warrant to search the phones to establish probable cause to believe that evidence of a crime would be found on the cellphones. The application for a warrant noted that in the applicant's training and experience[12], he is aware that drug traffickers commonly use cellphones to communicate and further their drug activities. Specific to Bobo, Task Force Agent Adams related the facts of the underlying investigation; that is, that Bobo was a known drug dealer, that he had been the subject of surveillance during the prior month and the previously described observations made by officers on September 11, 2020.[13] Task Officer Adams noted that based on law enforcement

---

[12] As noted previously, the application in support of the warrant to search the cellphones was completed by Task Force Officer Adams.  At the time he applied for the warrant, Task Force Officer Adams had been with the WPD since 1994 and assigned to the Special Crimes Division since February 2005.  Since July 2016, he has been assigned as a Task Force Officer with the ATF. He has been involved in hundreds of investigations, including drug and firearms investigations. In connection therewith, he has interviewed defendants, informants and others involved in the sale and distribution of illegal drugs, has participated in numerous search and arrest warrants involving drug trafficking, and has observed illegal drug deals taking place. Furthermore, based on his training, education and experience, he is familiar with the manner and means employed by drug traffickers and drug organizations to conduct illegal activities.

[13] In his affidavit in support of the application for a warrant to search 11 Franklin, Officer Williams stated that the CS had reported that Bobo had told him/her that he used his cellphones to conduct his drug activities. This

officers knowledge of Bobo and their observations of Bobo, the meeting with Kromah at 345 Greenwood appeared to have been pre-arranged.  However, agents observing Bobo that morning did not see any face-to-face meetings with Kromah prior to that meeting or during the surveillance conducted the prior month—therefore, it can be inferred that the meeting was arranged via telephone.

Moreover, during the search of 11 Franklin, law enforcement found evidence of drug trafficking which was linked to Bobo through fingerprints and documentary evidence. Drug traffickers frequently use cell phones to purchase their supply of illegal drugs and set up transactions and store relevant information related to their activities, and therefore, it is likely that the cellphones would contain evidence of illicit drug activity.  Moreover, the fact that Bobo was in possession of two cellphones that morning creates a further inference that he was using the cellphones in his drug trafficking business as drug traffickers often use multiple phones—one used to communicate with drug customers and others used to communicate with suppliers, runners and other drug related associates. Considering the totality of the circumstances, I find that there was probable cause to believe that evidence of criminal activity could be found on Bobo's cellphones.  *Accord United States v. Lindsey,* 3 F.4th 32, 39-40 (1st Cir. 2021)(nexus between crime and alleged place to be searched may be inferred from type of crime, nature of evidence sought and normal inferences as to where criminals may hide evidence of their crimes).

<u>Whether the Search Warrant was Overbroad</u>

The search warrant for the cellphones permitted law enforcement to conduct searches of the phones using whatever data analysis techniques necessary to locate and retrieve evidence, such as photographs, emails, messages, applications, videos and records, in whatever forms,

---

fact was not included in Task Force Agent Adam's affidavit and therefore, has not been considered by the Court in determining whether probable cause existed.

including those related to: drug activities; lists of customers and related identifying information; any information recording schedules, whereabouts or travel (including calendar, e-mails, cell tower and GPS data); bank records, checks, credit card bills, account information, and other financial records; the identity, location and travel of co-conspirators; possession or purchase of firearms or ammunition; information concerning the purchase of Luis Vuitton bags; information concerning Massachusetts Department of Health medical marijuana card; and information concerning the Twin Rivers Casino Hotel. The warrant also permitted law enforcement to search for evidence of attribution showing who used or owned the phones during the relevant period, and records of evidence of use of the internet (including, Internet Protocol addresses used), records of internet activity (including firewall logs, caches, browser history, cookies, favorite web pages, search terms and the like).

Bobo asserts that the warrant application was overbroad in that in that it did not limit the particular applications/locations on the phones to be searched, instead allowing law enforcement to forage throughout the entire phone accessing all available information, thus, failing the particularity test—that is, the application failed to sufficiently identify what information is likely to be found on the phone and where it is likely to be located.  For the following reasons, I disagree. Evidence can be found in multiple locations/applications on a cellphone—indeed, there are numerous ways in which a defendant can hide evidence of crimes in seemingly innocuous places. Since "criminals don't advertise where they keep evidence …" a warrant generally authorizes a search "everywhere" because that is where evidence of the crime "may be hidden." *Accord United States v. Deschambault,* No. 2:19-cr-00187-JAW-1, No. 2:21-cr-00146-JAW-1. 2022 WL 2916052 (D.Me. Jul. 25, 2022)(quoting *United States v. Loera,* 923 F.3d 907 (7th Cir. 2018)(internal quotation marks omitted).  Thus, while law enforcement may be limited in that

they can only look for and seize the information sought, they are not limited as to where on the phone they may search for such information.  Accordingly, I find that the search warrant was not overbroad.

<u>*Delay in Obtaining the Warrant*</u>

Law enforcement did not apply for a warrant to search the cellphones until January 27, 2021, over four months after the cellphones were seized.  Bobo argues that this amounted to undue delay in obtaining the warrant requiring suppression of all evidence obtained from the cellphones.  The Government argues to the contrary.

The initial investigation was conducted by the WPD and was under its jurisdiction at the time of Bobo's arrest and seizure of the cellphones. Sometime after Bobo's arrest, the case was transferred to the federal government (it is not clear from the parties' submissions when this occurred) at which time the additional warrant was sought. Bobo has been detained since his arrest and, prior to the application for a search warrant, the cellphones were maintained in the possession of the WPD.

With this background in mind, in obtaining a search warrant, "[t]here is no bright-line rule separating reasonable delays from unreasonable ones." *United States v. Berroa*, Crim. Act.No. 1-cr-10164-ADB, 2021 WL 149254 (D.Mass. Jan. 15, 2021).  The Second Circuit has established the following four factors to determine if a delay in obtaining a warrant is so excessive as to be unreasonable and thus, in violation the Fourth Amendment: "(1) the length of the delay, (2) the importance of the seized property to the defendant, (3) whether the defendant had a reduced property interest in the seized items, and (4) the strength of the state's justification for the delay." *United States v. Smith*, 967 F.3d 198 (2$^{d}$ Cir. 2020). I agree with the *Berroa* court that application of these factors is instructive.  First, the length of the delay (some four months)

falls somewhat in the middle of those delays which other courts have found reasonable versus

unreasonable. *See* cases cited in *Berroa*, 2021 WL 149254 at *4. There is nothing in the record to

suggest that the delay was the result of bad faith— the delay can largely be attributed to the fact

that jurisdiction of the case was transferred from the state to the federal government.

Additionally, unlike in several the cases where the courts' have found unreasonable delay, the

evidence obtained from Bobo's phones was not necessary for the Government to determine that

criminal charges against him were warranted, that is, probable cause existed to believe that he

had committed a crime independent of the search of his cellphones. While one can assume that

Bobo had personal, private information on the cellphones, he has not asserted that such is the

case. Bobo has not consented to the search of his cellphones and maintains a possessory interest

therein. However, he was detained after the arrest (and continues to be detained) and therefore,

arguably has a reduced property interest in therein — indeed, he had not made any attempt to

have the phones returned to him (or someone on his behalf). Additionally, the Court does not

discern, and Bobo has not pointed out, any prejudice resulting from the delay.  In *Berroa,* the

Court found no prejudice although application for the search warrant had been delayed fifteen

months and despite evidence from the cellphones being disclosed "late in the game." *Id.,* at *6-

*7. However, in this case, the warrant to search the cellphones was applied for some three

months prior to the issuance of the Indictment and therefore, Bobo cannot argue that that he had

insufficient time to review the evidence seized therefrom prior to assessing how to procced in

this case and/or establish a defense. Under the circumstances, the Court does not find that the

delay in obtaining the warrant was unreasonable.  Moreover, even if the delay can be deemed

unreasonable, I agree with the Government that given that Bobo has not identified any prejudice

to his case because of the delay or any bad faith on the part of the Government, exclusion of the

evidence would not serve any purpose and the motion to suppress would be denied for that reason.

**<u>Conclusion</u>**

For the reasons above, the Court **_<u>denies</u>_** Defendants' motions to suppress.  (Docket Nos. 51, 53, & 55).

**SO ORDERED**

**_<u>/s/ Timothy S. Hillman</u>_**
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**
